Paul PALMIERI, Plaintiff–Appellant,

v.

Pamela LYNCH, aka Pam Lynch, John Doe #1, Defendants–Appellees.

Docket No. 03–9038.

United States Court of Appeals, Second Circuit.

Argued: June 23, 2004.

Decided: Dec. 10, 2004.

R. Bertil Peterson, Staff Counsel for The Coalition of Landlords, Homeowners & Merchants, Inc., Babylon, New York, for Plaintiff–Appellant.

Gregory J. Nolan, Assistant Attorney General, Environmental Protection Bureau, New York, N.Y. (Marion R. Buchbinder, Senior Assistant Solicitor General; Norman Spiegel, Assistant Attorney General, Environmental Protection Bureau; and Eliot Spitzer, Attorney General of the

State of New York, on brief), for Defendants–Appellees.

Before: MINER, CABRANES and STRAUB, Circuit Judges.

Judge STRAUB concurs in part and dissents in part in a separate opinion.

MINER, Circuit Judge:

Plaintiff-appellant, Paul Palmieri, appeals from a judgment entered in the United States District Court for the Eastern District of New York (Seybert, *J.*), dismissing Palmieri's 42 U.S.C. §§ 1983 and 1985 claims, asserting Fourth Amendment violations, and declining to exercise supplemental jurisdiction over his state-law trespass claim. The court determined that the defendants-appellees, Pamela Lynch and John Doe # 1,[1] employees of the New York State Department of Environmental Conservation ("DEC"), did not violate Palmieri's Fourth Amendment rights by traversing, without permission, the front and backyard of Palmieri's residence in Babylon, New York in an attempt to perform a regulatory inspection. The areas to be inspected were a residential dock and adjacent areas located on tidal wetlands off the rear portion of Palmieri's back yards. The site visit by the DEC and the aborted regulatory inspection attempt occurred in response to Palmieri's application to extend his ninety-two-foot-long dock by an additional fifty feet and to add an additional boat lift to the two already in place.

Palmieri's claim is one essentially sounding in trespass quare clausum fregit that has escalated into a constitutional claim of Fourth Amendment violations only because the trespassers were representatives of a state government regulatory agency. The very brief, albeit trespassory, entry of these state actors was responsive to Palmieri's desire to obtain a necessary permit to conduct construction work on his property.

That the agents were dispatched by Palmieri within minutes of their entry and that no damage was done might have justified the disposition of this case by application of the maxim de minimis non curat lex. Because of the constitutional issues raised, however, we are constrained to undertake the more elaborate analysis that follows.

## BACKGROUND

Palmieri owns a parcel of residential waterfront property (the "property"), in Babylon, New York. The property is situated on Long Island's Great South Bay and encompasses both New York State regulated tidal wetlands and a regulated adjacent area. It is bordered on the front (or "north"), by East Shore Drive; on the back (or "south"), by the Great South Bay; and on each side ("east" and "west"), by neighboring residential properties that are similarly sized and situated. Palmieri's house (the "house") sits roughly in the center of the property. Stockade fencing extends along the east and west property lines of the property, separating it from his neighbors' lots physically, and, to a limited extent, visually. In addition, fencing extends from, and lies roughly perpendicular to, the sides of the house and connects to the fencing on the east and west property lines. Thus, this system of fences, along with the house itself, completely encloses the side and rear areas of the property physically on the north, east, and west sides. These areas include the backyard; a deck, connected to the back of the house and elevated approximately five to six above the backyard; and, bordering the property to the south, the bulkhead, dock, and waterfront. In the fence extending from the side of the house to the

1. John Doe # 1 is presumably the intern who accompanied Lynch on her inspection. To date, John Doe has not been identified in this litigation, nor has he been served with a copy of the Complaint.

east property line is a gate (the "gate"), on which has been affixed a "PRIVATE PROPERTY—NO TRESPASSING" sign and a "BEWARE OF DOG" sign. The gate, which is typically kept closed but unlocked, provides physical access from the front of the property to the enclosed side and rear areas.

In March 1993, Palmieri submitted an application to the DEC for a tidal-wetland permit to extend his fifty-two-foot residential dock/pier (the "Dock") by an additional 110 feet into the Great South Bay, as well as to build two elevator boat lifts. This application was denied by the DEC in November 1993. After Palmieri filed an administrative appeal, the parties reached a settlement, pursuant to which the DEC issued a tidal-wetland permit to extend the Dock by forty feet and to build one additional boat lift. The permit contained a condition providing that the property that was the subject of the permit was "subject to inspection at reasonable hours and intervals by an authorized representative of the DEC to determine whether the permittee is complying with this permit" and the New York State Environmental Conservation Law ("ECL"). A permit for the installation of a fence on the bulkhead (i.e., the barrier between the beach front and the backyard areas), which was issued to Palmieri in January 1999, contained an identical condition.

Palmieri refused to grant the DEC physical access to his property to perform the inspections, and he notified the DEC of his refusal to allow such access by letters dated October 8, 1997, May 11, 1999, and January 19, 2000. Initially, the DEC complied with Palmieri's wishes, and its employees conducted inspections of the premises by boat without entering onto his property.

In May 1999, Palmieri submitted another application for a tidal-wetlands permit to extend his now ninety-two-foot-long Dock by an additional fifty feet and to add a third boat lift. In April 2000, Defendant-appellee Pamela Lynch, a DEC Marine Resource Specialist ("Specialist Lynch" or "Lynch"), was assigned to review Palmieri's application. Specialist Lynch's duties included making on-site inspections in connection with the review of applications for tidal-wetland permits. On March 10, 2000, Palmieri allegedly mailed a letter to Lynch restating his refusal to consent to a land-based inspection of the premises.[2]

Nevertheless, on April 3, 2000, Specialist Lynch and another person from the DEC (referenced in the complaint as "John Doe # 1") visited the premises for the purpose of inspecting the Dock and the tidal wetlands in connection with the DEC's review of Palmieri's then-pending application. The purpose of the inspection was to determine whether the plans submitted in connection with the application accurately reflected current conditions, to examine the current condition of the tidal wetlands on and near the site, and to evaluate the possible impact of the proposed project on those wetlands.

Once Specialist Lynch arrived at Palmieri's property, she rang the front doorbell and knocked. Not hearing any response, Lynch walked around to the side of Palmieri's house to gain access to the Dock and the shorefront and adjoining areas of the premises. To reach those areas, Lynch entered Palmieri's enclosed rear yard through the closed gate bearing the "No Trespassing" and "Beware of Dog" signs. At that point, Palmieri, holding a video camera that was recording the scene on

2. Lynch denies ever having received this letter. For the purposes of summary judgment, the District Court assumed, as do we, that Lynch received this letter.

videotape, ran up to Specialist Lynch and asked who she was. Lynch showed Palmieri her DEC identification and told him that she had come to make an inspection in connection with his permit application. Palmieri then ordered her off his property, warning her that she was trespassing and that she would be arrested if she did not leave immediately. As he was physically escorting her off his property, Specialist Lynch explained that, if she could not complete her inspection, she could not complete her review of Palmieri's permit application. Specialist Lynch then left without further discussion. The entire encounter between Lynch and Palmieri lasted no more than three minutes.

In June 2000, Palmieri filed an action in the United States District Court for the Southern District of New York, pursuant to 42 U.S.C. §§ 1983 and 1985, against Lynch and "John Doe #1," alleging a violation of Palmieri's Fourth Amendment rights, a conspiracy to violate his Fourth Amendment rights, and common law trespass. Specifically, Palmieri alleged that his Fourth Amendment right to be free from a warrantless search had been violated by Lynch's attempt to inspect the Dock by entering his property without his consent and that the entry also constituted a trespass. Shortly after Palmieri commenced this action, a DEC Permit Administrator advised Palmieri, by letter dated July 7, 2000, that his permit had been denied due to his failure to allow an inspection. Palmieri then requested an adjudicatory hearing on the denial of his permit application. In response, the DEC argued that its denial of the permit application should be affirmed without the need for an adjudicatory hearing, on the ground that Palmieri declined to consent to an on-site inspection.

While discovery continued in the District Court, an Administrative Law Judge ("ALJ") issued a decision recommending that the July 2000 Notice of Denial be vacated and replaced with a Notice of Incomplete Application in light of Palmieri's refusal to permit an inspection. The ALJ further recommended that Palmieri's request for a hearing be treated as void since such a request could not be made in response to a Notice of Incomplete Application. On February 1, 2002, the Commissioner of the DEC issued a ruling adopting the ALJ's recommendations. The Commissioner deemed Palmieri's permit application to be incomplete because of his refusal to permit Specialist Lynch to inspect his property. Accordingly, the Commissioner refused to take further action on the application or to schedule a hearing on it until the inspection had occurred.

Palmieri then commenced an Article 78 proceeding in the New York Supreme Court, Suffolk County, challenging the Commissioner's decision. In his Article 78 petition, Palmieri argued that: (i) an on-site inspection by a DEC staff member was not required before a permit application could be deemed complete; (ii) an adjudicatory hearing was available for review of a permit denial based on the incompleteness of an application; (iii) DEC's attempt to enforce a non-consensual, warrantless site inspection violated his Fourth Amendment rights; and (iv) his property did not come within DEC's wetlands permit jurisdiction, and therefore, he did not need a DEC permit to extend the Dock.

In October 2002, Specialist Lynch moved in the District Court for summary judgment at the close of discovery arguing that, as a matter of law, Lynch had not violated Palmieri's Fourth Amendment rights and that, even if it was determined that she had done so, she was entitled to qualified immunity. In opposing summary judgment, Palmieri argued that: (i) the inspection provisions in his previous per-

mits had not authorized the inspection of his premises because the permits had expired upon the completion of the projects that they had authorized; (ii) the current permit application did not require an on-site inspection; (iii) DEC did not have jurisdiction with respect to tidal wetlands within Suffolk County; and (iv) Lynch was not entitled to qualified immunity, given the letter she received telling her not to inspect his premises and the "NO–TRES-PASSING" sign that was visible to her.

In May 2003, while Specialist Lynch's summary judgment motion was pending, the Suffolk County Supreme Court granted Palmieri's Article 78 petition. As an initial matter, the court rejected Palmieri's arguments that the DEC lacked jurisdiction over his permit request and that the site inspection violated his Fourth Amendment rights. With respect to the Fourth Amendment claim, the court determined that "an on-site inspection is a minimal intrusion and [Palmieri's] project poses a diminished expectation of privacy and . . . is a matter of significant governmental interest." The court also determined, however, that the DEC could require an on-site inspection in connection with Palmieri's permit application only if such an inspection was reasonably necessary to process his application. The state court, therefore, determined that Palmieri was entitled to an adjudicatory hearing on whether DEC's demand for an on-site inspection was reasonably necessary.

In an eighteen-page, unpublished memorandum and order dated August 29, 2003, the District Court granted Specialist Lynch's summary judgment motion, dismissed Palmieri's federal claims, and declined to exercise supplemental jurisdiction over his pendent trespass claim. First, the District Court concluded that DEC had jurisdiction over tidal wetlands in Suffolk County. Second, the District Court found that the activities relating to Palmieri's purported Fourth Amendment violation fell under the "special needs" exception, given the regulatory scheme pursuant to which the DEC inspection was conducted. Third, the District Court found that Palmieri had a "diminished expectation of privacy in his backyard." Fourth, the District Court concluded that the "level of intrusion presented in this case was minimal." Fifth, the District Court found that New York State and the DEC had a "strong interest in protecting and regulating tidal wetlands" and that this governmental interest "outweigh[ed] the diminished expectation of privacy that [Palmieri] had, particularly in light of the minimal intrusion to which he was subjected to." Finally, Judge Seybert found that Palmieri's § 1985 claim failed as a matter of law because Palmieri had "offered absolutely no proof of a claim of class based animus" or of "any agreement . . . between any individuals" that would establish the existence of a conspiracy.

Final judgment was entered on September 9, 2003, and this timely appeal followed.

## DISCUSSION

To prevail on his § 1983 claim, Palmieri must show that Specialist Lynch acted under color of state law and that she deprived him of a right secured by the Constitution or laws of the United States. *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir.1994). Here, there is no dispute that Lynch was acting under color of state law when she arrived at Palmieri's house to conduct the inspection. Thus, the question before the District Court—and now before us in this appeal—is whether Lynch violated Palmieri's Fourth Amendment rights.

### I. *Special Needs Exception*

■ A warrantless inspection of a private dwelling by a municipal administra-

tive officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances. *See Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528–29, 539–40, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (reversing an individual's conviction for refusing to allow a warrantless inspection of his residence by municipal building inspectors because the inspection was a significant intrusion and lacked "compelling urgency"); *see also Sokolov v. Vill. of Freeport,* 52 N.Y.2d 341, 343, 344–46, 438 N.Y.S.2d 257, 420 N.E.2d 55 (1981) (prohibiting the warrantless inspection of residential rental property to check on health conditions).[3] However, "searches pursuant to a regulatory scheme need not adhere to the usual requirements" where special governmental needs are present. *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

Thus, "in limited circumstances, a search unsupported by either [a] warrant or probable cause can be constitutional," but only where " 'special needs' other than the normal need for law enforcement provide sufficient justification." *Ferguson v. City of Charleston,* 532 U.S. 67, 76 n. 7, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). Moreover, the Supreme Court has observed that, typically, such "special needs" will be recognized only where "the usual warrant or probable-cause requirements" have somehow been rendered impracticable. *See Griffin,* 483 U.S. at 873.

Warrantless searches have regularly been allowed when they were conducted pursuant to some legislated regulatory scheme in situations in which there was found to exist a diminished expectation of privacy.[4] The special needs doctrine, in

---

3. The circumstances in which a warrantless search of a private dwelling is deemed constitutional are narrow and specific. *See, e.g., Michigan v. Tyler,* 436 U.S. 499, 511, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (holding that "an entry [into a building] to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze" without running afoul of the Fourth Amendment); *accord United States v. Callabrass,* 607 F.2d 559, 563 (2d Cir.1979) (upholding a defendant's conviction based upon evidence seized—within three hours after the fire was extinguished—by fire fighters and a police detective because "entry into a burn[ed] building clearly presents an exigency of sufficient proportions to render a warrantless entry reasonable" (internal quotation marks omitted)); *see also, e.g., Griffin v. Wisconsin,* 483 U.S. 868, 871–73, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (allowing a warrantless entry by a probation officer into a probationer's residence to investigate the suspected presence of contraband because the "special needs" of law enforcement make the "warrant and probable-cause requirement impracticable"); *Wyman v. James,* 400 U.S. 309, 318, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (allowing a particular warrantless visit and entry by a social caseworker to determine compliance with welfare requirements).

4. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (analogizing student-athletes to employees in closely regulated industry, who "have reason to expect intrusions upon normal rights and privileges, including privacy"); *accord Bd. of Educ. v. Earls,* 536 U.S. 822, 832, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (applying the same reasoning to students who participate in extracurricular activities); *see also Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 627, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (noting that railroad employees have a diminished expectation of privacy because they participate in a pervasively regulated industry); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.,* 158 F.3d 361, 379 (6th Cir.1998) (finding that teachers' legitimate expectation of privacy is diminished by their participation in a heavily regulated industry); *Int'l Bhd. of Elec. Workers, Local 1245 v. United States Nuclear Reg. Comm'n,* 966 F.2d 521, 526 (9th Cir.1992) (upholding random testing of clerical workers in protected areas of a nuclear plant where "at least some" of the workers entered vital areas and "may have [had] safety-related responsibilities"); *AFGE Local 1533 v. Cheney,* 944 F.2d 503, 506 (9th Cir.1991) (upholding the random testing of engineers who were required to hold top-secret access clearances, even

particular, has been applied in a number of cases involving the residences of parolees or probationers. *See Griffin,* 483 U.S. at 870 (1987); *Moore v. Vega,* 371 F.3d 110, 113 (2d Cir.2004). Application of the special needs doctrine, however, has not been limited to the heartland of cases in which the doctrine has its genesis. For example, in *New York v. Burger,* 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), the Supreme Court held:

> Because the owner or operator of commercial premises in a closely regulated industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context. Rather, we conclude that, as in other situations of special need, where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

*Id.* at 702, 107 S.Ct. 2636 (citations and internal quotation marks omitted).

This Circuit, for example, recently applied the special needs exception in the employer-employee context to determine the constitutionality of the warrantless search of a government employee's government-issued computer for non-standard software. *See Leventhal v. Knapek,* 266 F.3d 64, 68–69 (2d Cir.2001). There, we justified the warrantless search of the public employee's office computer, despite the fact that the employee had a reasonable expectation of privacy, because we concluded that "the special needs of public employers" in "conducting [warrantless] workplace searches relat[ing] to investigations of work-related misconduct" outweighed the employee's expectation of privacy. *Id.* at 73; *see also New Jersey v. T.L.O.,* 469 U.S. 325, 353, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring in judgment) (applying the special needs exception in a school setting where the "government has a heightened obligation to safeguard students whom it compels to attend school" and justifying excepting the school search from the warrant and probable-cause requirement after "balancing the relevant interests"); *cf. Donovan v. Dewey,* 452 U.S. 594, 602, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (concluding that the surprise "warrantless inspections required by the Mine Safety and Health Act do not offend the Fourth Amendment" because there is a strong governmental interest with regard to "improving the health and safety conditions in the Nation's underground and surface mines").

We think it is wise for courts to be cautious in applying the special needs doctrine, given that it allows for a degree of governmental intrusion into concededly private areas. But we cannot escape the conclusion that in cases such as the one at bar, the doctrine may be especially applicable, given its utility in providing a framework to balance important non-arbitrary governmental objectives against de minimis intrusions in situations in which there is some degree of an expectation of privacy. Employing an analysis of the special needs

though they might not ever have actually handled classified information); *Int'l Bhd. of Teamsters v. Dept. of Transp.,* 932 F.2d 1292, 1304 (9th Cir.1991) (upholding random drug testing of commercial truck drivers); *Int'l Bhd. of Elec. Workers, Local 1245 v. Skinner,* 913 F.2d 1454, 1458 (9th Cir.1990) (upholding random testing of all employees engaged in operations, maintenance, or emergency response functions on gas pipelines); *Bluestein v. Skinner,* 908 F.2d 451, 457 (9th Cir.1990) (upholding FAA regulations requiring random drug testing of flight instructors and dispatchers).

doctrine to determine whether an application of the special needs exception is warranted is not outcome-determinative at the inception of the analysis, nor does such an inquiry into the applicability of the special needs exception make all other types of routine, regulatory inspections permissible. Rather, the inquiry into the special needs doctrine and the application of the special needs exception simply allows this court, or any reviewing court, to make a constitutional inquiry concerning the government's challenged conduct and to balance or weigh the government's regulatory interests against the individual's protected privacy interest under the Fourth Amendment. Here, we utilize the special needs doctrine to analyze the environmental regulatory scheme that provides for warrantless inspections pursuant to tidal-wetlands permit applications.

■ In applying the special needs doctrine, we must weigh the governmental conduct—in light of the purported special need and against the privacy interest advanced—by analyzing three principal factors: (1) "the nature of the privacy interest allegedly compromised by the [challenged governmental conduct]," *Earls*, 536 U.S. at 830, 122 S.Ct. 2559; (2) "the character of the intrusion imposed by the [challenged conduct]," *id.* at 832, 122 S.Ct. 2559; and (3) "the nature and immediacy of the [state's] concerns and the efficacy of the [governmental conduct] in meeting them," *id.* at 834, 122 S.Ct. 2559.

A. *The Nature of the Privacy Interest*

■ "[A] Fourth Amendment search does *not* occur—even when the explicitly protected location of a house is concerned—unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society [is] willing to recognize that expecta-

tion as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (internal quotation marks omitted). Moreover, a merely "visual observation is no 'search' at all." *Id.* at 32, 121 S.Ct. 2038; *see also Arizona v. Hicks*, 480 U.S. 321, 328, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) ("A truly cursory inspection—one that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion").

(1) *Subjective Expectation of Privacy*

■ With regard to the first prong of the test for demonstrating a legitimate expectation of privacy, "the person challenging the search must demonstrate a subjective desire to keep his or her effects private." *United States v. Paulino*, 850 F.2d 93, 97 (2d Cir.1988). Here, the District Court found that, by erecting a fence, posting a "No Trespassing" sign, and writing letters indicating his refusal to consent to a search of his property, Palmieri "clearly exhibit[ed] a legitimate ... subjective expectation of privacy." We agree.

(2) *Objectively Reasonable Expectation of Privacy*

In regard to whether, and to what degree or extent, Palmieri's subjective expectation of privacy was objectively reasonable, "the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection," *United States v. Martinez–Fuerte*, 428 U.S. 543, 561, 565, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), but, "[a]lthough society generally respects a person's expectations of privacy in a dwelling, what a person chooses voluntarily to expose to public view ... loses its Fourth Amendment protection," *United States v. Fields*, 113 F.3d 313, 321 (2d Cir.1997). Thus, "the route which any vis-

itor to a residence would use is not private in the Fourth Amendment sense." *United States v. Reyes*, 283 F.3d 446, 465 (2d Cir.2002) (internal quotation marks omitted).

■ Here, the District Court found certain facts in the record to be undisputed. In particular, Judge Seybert observed:

Palmieri's house faces a public street on the front and navigable waters and a beach accessible to the public at the rear. Even though he erected a fence, all of the space around Palmieri's house is completely exposed to public view. [He] made a voluntary choice to live on this "exposed" property.

In light of these facts, the court concluded that Palmieri had a "privacy interest in his backyard" that was "severely diminished." This finding stemmed also from the fact that (i) Palmieri had been "issued pervious permits, one of which had not yet expired at the time of this incident"; and (ii) "[t]he previous permits provide[d] that, as a condition of receiving the benefit of the permit, the site was open to routine inspection by the DEC." We concur in the District Judge's determination and observe, as well, that Palmieri's applications to permit construction on state-regulated wetlands further diminishes Palmieri's privacy interest in the at-issue areas. Indeed, we find his privacy interest in these areas somewhat analogous to the diminished level of privacy interest typically recognized to reside in other regulated zones of activity in the public sphere. *See supra* note 4; *see also United States v. Biswell*, 406 U.S. 311, 315–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

On appeal, Palmieri principally argues that the District Court resolved certain material factual disputes against him in concluding that this expectation of privacy was "diminished" to the point that it was unreasonable as a matter of law. Specifi-

cally, Palmieri charges the District Court with erroneously "finding" that (i) "there was no fence surrounding the perimeter of [his] property ... including the rear boundary"; (ii) his property "was completely exposed to public view"; and (iii) his "house face[d] a public street on the front and navigable waters and beach accessible to the public at the rear." In so contending, however, Palmieri misconstrues the purpose of summary judgment, which is entirely appropriate where, as here, certain material facts are before the court but clearly not in genuine dispute. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003) (holding that when a party opposes a motion for summary judgment, this Court may disregard unsupported assertions and review the record independently).

For example, photographic evidence in the record unmistakably reveals that the "fence" along the bulkhead in the backyard is a single strand of heavy rope strung between upright posts several feet apart and provides virtually no obstruction to a view of the water from the backyard and, thus, no obstruction of the view of the backyard from the water. Furthermore, the drawings submitted by Palmieri in connection with his permit applications show a beach between the bulkhead and the mean low water line not crossed by fences. Moreover, while portions of the property are physically enclosed by stockade fencing, the video recorded by Palmieri demonstrates that much, if not all, of Palmieri's backyard is clearly visible from the rear deck and backyard areas of at least one of his neighbor's homes. The video shows that the east-side fence serves only as a physical barrier between Palmieri's backyard and his neighbor's backyard areas and that, because Palmieri's rear deck is elevated, the east-side fence does not in any way restrict the line of sight between

Palmieri's deck and the deck in his neighbor's backyard.[5] In any event, Palmieri introduced no evidence in opposing summary judgment to rebut the record evidence.

We note that the Supreme Court has recognized that unusual circumstances can combine to create a zone of privacy interests that "can perhaps be seen as falling somewhere between 'open fields' and curtilage, but lacking some of the critical characteristics of both." *Dow Chem. Co. v. United States,* 476 U.S. 227, 236, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *cf. United States v. Haqq,* 278 F.3d 44, 54 (2d Cir. 2002) (recognizing the different levels or degrees of privacy interests between the inside of one's home and other areas: "The protection of the Fourth Amendment, by necessity, exists in degrees."). We, therefore, do not necessarily agree with the District Court that the privacy interest in the at-issue areas was objectively unreasonable merely because the areas are open to public view. It would seem indisputable, however, that Palmieri's backyard and deck possess a considerably lesser degree of privacy than the interior spaces of his dwelling. *See California v. Ciraolo,* 476 U.S. 207, 212–13, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *see also United States v. Gori,* 230 F.3d 44, 54 (2d Cir.2000) ("No one in a place opened to public view can expect privacy in that place and at that time."). In support of our conclusion that Palmieri possessed a diminished expectation of privacy in the relevant areas, photographic evidence in the record plainly shows that the rear areas of Palmieri's home are freely observable to the public

from the water and from the rear deck and yard of at least one of Palmieri's neighbors. In sum, because of this ease of observability and because the intrusion was minimally intrusive and advanced a strong, countervailing government interest, Palmieri's expectation of privacy, though present to some degree, is unquestionably diminished.

Palmieri's asserted privacy expectation was diminished for other reasons as well. For one, he had applied for a construction permit and was on notice that the application process would involve some form of site inspection. The fact that the DEC had been able to accommodate his wishes in the past and inspect his property by boat was no guarantee that it would, or was required to, continue to do so. Further, there would be a number of undesirable practical implications were applicants allowed to dictate to the DEC how it could conduct inspections. We should not allow applicants to interfere, without good reason, with the DEC's ability to fulfill its statutory and regulatory mandate in a reasonable manner of its choosing.

For the reasons set forth above, we conclude that while Palmieri had an expectation of privacy that was to some degree objectively reasonable, that expectation of privacy was nonetheless diminished. While the expectation of privacy here weighs against applying the special needs exception, the fact that the expectation is a diminished one significantly mitigates the extent to which this factor weighs against applying the exception.

---

**5.** Palmieri recorded the video while standing in his backyard. It logically follows that if the line of sight in Palmieri's video recording can easily show his neighbor's backyard and elevated rear deck, then Palmieri's neighbors, while sitting on their elevated rear deck in their backyard, can also easily view Palmieri's rear deck and backyard. Further, the video shows that the side yards of the two residences are narrow and contiguous to each other. These details are highly relevant here, where we must consider what, if any, expectation of privacy Palmieri had in his backyard.

B.  *Character of the Intrusion*

■ The second special-needs factor requires an analysis of the character of the intrusion imposed by the regulatory agency's attempted visual inspection of Palmieri's dock and backyard. Here, the District Court found that "the level of intrusion ... was minimal." Specifically, Specialist Lynch sought to visually inspect Palmieri's Dock and adjoining wetlands to evaluate his permit application. Lynch did not seek to inspect the interior of his house, his personal property, his person, or any closed containers. As the District Court explained, Lynch "at worst, committed a trespass." *Cf. Air Pollution Variance Bd. v. Western Alfalfa Corp.,* 416 U.S. 861, 864–65, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974) (reversing a Colorado Court of Appeals decision that applied Fourth Amendment protection to private property that was open to public viewing, in the open-fields context, and that had been trespassed upon by a state inspector, and holding that such trespass entailed an "invasion of privacy ... if it can be said to exist, [that] is abstract and theoretical"); *see also Reed v. Schneider,* 612 F.Supp. 216, 221 (E.D.N.Y.1985) ("Technical trespasses have been found not to constitute unreasonable searches."). That Lynch could have performed the inspection using a less intrusive means—for example, from the water (as had been done in the past)—does not alter the conclusion that the character of Lynch's intrusion was de minimis.

A review of the relevant facts is illuminating. After ringing the front doorbell and getting no response, Lynch entered the backyard through the gate, intending to pass through the yard on her way to the waterfront areas of the property. Her intention, however, was merely to perform her duties relative to the evaluation of Palmieri's most recent permit application—namely, to inspect the wetland, its adjacent areas, and the existing dock in connection with the review of the current application in order to determine the potential impact of the proposed construction project. As even Palmieri acknowledges, Lynch's sole purpose in entering his property was to inspect the waterfront areas. The record further suggests that, even in her own mind, Specialist Lynch considered the inspection entirely routine, as evidenced by her obvious shock at being chased off the property by Plaintiff (at the barrel of a camera lens, no less). Moreover, Lynch's brief intrusion came to an end before she was able to conduct the inspection of the dock and its adjoining areas. Indeed, Lynch departed the premises as soon as Palmieri instructed her to leave. *Cf., e.g., Moore v. Vega,* 371 F.3d 110, 112–13, 118 (2d Cir.2004) (finding that the defendant officers, who entered the wrong house to conduct a warrantless search for an absconded parolee, did not violate the Fourth Amendment because the officers' conduct was reasonable, given that the officers left the house upon learning that the information relied upon to search that particular residence was incorrect). In light of the minimally-intrusive nature of the entry, and the fact that Specialist Lynch exited the premises immediately upon being told to do so, *see id.* at 118, and without even having performed the inspection of the dock and adjoining areas to ascertain the impact of the proposed construction on the state-regulated tidal wetlands, we find that the second special-needs factor weighs heavily against the Plaintiff.

C.  *Nature and Immediacy of Governmental Interest*

■ The third special-needs factor requires an examination of the nature of the governmental interest at issue. Here, the District Court found that "the governmen-

tal interest ... in protecting the natural resources and the public beaches and waterways[ ] is serious." We agree. Indeed, while there is no case law directly on point with respect to an environmental inspection of *residential* property, there can be no principled distinction made between the need to inspect commercial property and the need to inspect residential property where the residential property consists of protected tidal wetlands. Such wetlands are a well-regulated zone in the public sphere of concerns. It is axiomatic in this day and age that the state's interest in performing regulatory inspections associated with applications to permit construction on protected tidal wetlands is unquestionably of the highest order. *See generally Gazza v. N.Y. State Dep't of Envtl. Conservation,* 89 N.Y.2d 603, 611–12, 657 N.Y.S.2d 555, 679 N.E.2d 1035 (1997) ("[T]idal wetlands constitute one of the most vital and productive areas of our natural world, and ... their protection and preservation are essential." (internal quotation marks omitted)). As the District Court observed, the state's regulatory interest in protecting and regulating tidal wetlands is evidenced by the very existence of the DEC; by legislation and regulations pertaining to wetlands; and by the permit application process in general.

While the DEC's need to perform the inspection at a given time, on a certain date, and in a specific manner may not be readily apparent, nothing in the record suggests that we should not credit the agency with diligently seeking to effectuate its statutory and regulatory mandate to inspect these areas and with attempting to afford expeditious consideration to Palmieri's overarching goal of obtaining the construction permit. While the agency may have lacked an *immediate* need to inspect the at-issue areas, this does not mean that no inspection was required or

appropriate. Indeed, it was Palmieri himself who set in motion the government conduct in question. Moreover, in *Leventhal,* this Court recently applied the special needs exception to a situation where immediate governmental concern was lacking. *See Leventhal,* 266 F.3d at 73–76.

In addition, as suggested above, there are a number of practical reasons why the DEC had a strong interest in effectuating the inspection in the manner of its choosing. For example, inspecting the tidal wetlands in this case by boat would have unduly burdened the DEC staff in a number of ways. First, there is nothing in the record to suggest that boats were routinely available to DEC marine biologists to use in conducting permit inspections. Thus, it is reasonable to assume that using a boat, as opposed to driving to the property by car and walking the site, would have entailed additional burdens of cost and time. Allowing applicants to overburden the DEC in this manner would backlog the entire application process for all applicants by reducing the number of inspections that DEC staff could effectively accomplish in a given day. Second, an inspection by boat would have entailed technical complications as well. The DEC needed to determine whether the existing dock-and-lift structures were causing impacts that could be compounded by increasing the length of the dock and the number of lifts. Since the existing structures extend from the upland, the DEC deemed it necessary to inspect the upland areas as well as the areas more easily accessible from the water. Accordingly, we find that the third special-needs factor weights entirely and heavily against Palmieri.

■ In sum, we hold that the special needs exception applies here because (i) the Plaintiff had a diminished expectation

of privacy in the publicly-viewable areas outside his home, (ii) the character of the intrusion by Specialist Lynch was minimal and largely encompassed the same degree of observation that could be accomplished from the water by any member of the public; and (iii) the state's interest in regulating construction on tidal wetlands overrode any asserted expectation of privacy in the outside areas of Palmieri's home that were adjacent to the water. As a final point of clarification, in response to any concern that our application here of the special needs balancing test could be interpreted as making all other types of routine regulatory inspections permissible, we note that we are not holding that any warrantless visit to premises under any environmental regime is permissible. Rather, we hold merely that an environmental regulatory scheme involving warrantless searches *may* be subject to a special needs "fact-specific balancing" test. *See N.G. ex rel. S.C. v. Connecticut,* 382 F.3d 225, 231–32 (2d Cir.2004) (internal quotation marks omitted). We recognize only that there are cases that fall within the "limited circumstances[ ] [where] the Government's need to discover ... latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed ... without any measure of individualized suspicion." *Earls,* 536 U.S. at 829, 122 S.Ct. 2559; *cf. Camara,* 387 U.S. at 530, 87 S.Ct. 1727 ("We may agree that a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime."). Accordingly, our holding merely allows courts to use the balancing test to determine the reasonableness of particular search activity in the enforcement of environmental regulatory schemes. It may well be the case that other environmental regulatory search activity will fail to satisfy the special needs balancing test. In such cases where the special needs exception is not warranted, the governmental agency could simply deny the applicant his or her desired permit or license until the applicant permits an inspection. We also note that nothing in our opinion affects Palmieri's right to pursue a state action for trespass.

## II. *Additional Discovery on the § 1985 Claim*

Finally, we conclude that the District Court properly dismissed Palmieri's § 1985 claim, as Palmieri failed to assert that there was "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999); *see Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Nor did Palmieri allege, "with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Thomas,* 165 F.3d at 147; *see Ellentuck v. Klein,* 570 F.2d 414, 426 (2d Cir.1978). Indeed, Palmieri failed either to allege an agreement or to aver any factual details concerning the inception or operation of the claimed conspiracy. Moreover, his argument on appeal that dismissal of his § 1985 claim was premature because he was afforded no discovery must be rejected.[6] Indeed, as Palmieri never contended that a class-

---

**6.** Moreover, docket entries in the record reveal the filing of an order, signed April 16, 2002 by the magistrate judge, certifying that discovery had been completed, and a memorandum from the magistrate judge's law clerk to the district judge's courtroom deputy, dated July 11, 2002, noting that discovery had been completed and that the action was trial ready.

based animus existed, nor alleged the existence of any circumstances indicating a conspiracy, there was simply no basis for discovery. *See Ellentuck*, 570 F.2d at 426 (dismissing the plaintiff's complaint for failure to "set forth facts showing some intentional and purposeful deprivation of constitutional rights" and to "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy"). Finally, Palmieri failed to pursue appropriate remedies below for inadequate discovery nor did he raise this argument in his opposition to summary judgement. Thus, this argument has been waived.

We have considered the Appellant's remaining arguments and find them to be without merit.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the District Court.

STRAUB, Circuit Judge, concurring in part and dissenting in part.

Until today, the special needs exception to the warrant clause of the Fourth Amendment had been conservatively applied to emergency situations, to commercial enterprises and public facilities governed by regulatory schemes, and to the living spaces of parolees. "Neither the Supreme Court nor this Court has ever permitted warrantless administrative

searches of a person's residence unless: exigent circumstances exist, business was conducted in the home, or the search was directed at convicted felons still serving sentences of probation or parole." *Anobile v. Pelligrino*, 303 F.3d 107, 120 (2d Cir.2002); *see also Michigan v. Clifford*, 464 U.S. 287, 291–92, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984)(reaffirming the view that administrative searches generally require warrants unless no significant privacy interest is implicated, exigent circumstances exist, and the purpose of the search is not primarily to gather evidence of criminal activity); *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 540, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)(holding that warrantless inspection of a private residence for possible housing code violations did not comport with the Fourth Amendment).[7] In the cases where warrantless searches have been sanctioned, either immediate and weighty public needs require a citizen to sacrifice temporarily the Fourth Amendment's protections, *see e.g. Clifford*, 464 U.S. at 293, 104 S.Ct. 641 (fire fighters may enter a burning building to "fight the blaze"), or citizens trade a portion of their Fourth Amendment protections in exchange for the privilege of engaging in activities that implicate significant public concerns and warrant close, regular, and, in some instances, spontaneous government scrutiny.[8]

Today the majority expands the narrow "special needs" exception to cover non-

---

**7.** The majority provides a fine summary of this "heartland" of special needs cases, *see ante* at 78–80, and also ultimately recognizes that today's decision represents an extension of the doctrine past these familiar borders, *see ante* at 85.

**8.** Unwarranted searches in the public school context cannot fairly be made to fit this mold. In these cases, however, the Supreme Court

has been careful to limit the privilege of conducting searches to school officials acting in their special relationships to minor students as defined by state regulations and guidelines aimed at the unique concerns germane to students' health and security. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *New Jersey v. T.L.O.*, 469 U.S. 325, 336–341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

exigent searches of private messuages[9] belonging to citizens who neither have nor are suspected to have committed any crime at all. This is an extraordinary step and it represents an aggressive shift in our Fourth Amendment jurisprudence away from the rights of individuals to maintain control of their homes toward the privilege of government agents to invade without either receiving consent or casting their claims of need into the crucible of judicial review. Nothing in the facts of this case or in our Fourth Amendment jurisprudence demands or permits that this step be taken.

Because I have no difficulty concluding that (i) no legitimate governmental interest would have been sacrificed by respecting the full array of Palmieri's Fourth Amend-ment rights in the curtilage surrounding his home; and (ii) the defendants' warrantless physical entry into Palmieri's curtilage in order to conduct an inspection was a significant Fourth Amendment intrusion; and (iii) the special needs exception does not excuse defendants' conduct, I respectfully dissent from those portions of the majority opinion that hold the contrary. I concur in the majority's conclusion that the District Court properly dismissed Palmieri's § 1985 claim.

I. *The Special Needs Balancing Test*

The majority does not dispute that defendants entered the curtilage surrounding Palmieri's home through a closed gate without permission[10] and without a war-

---

9. I employ this term in its modern, rather than its more archaic, usage, meaning a "dwelling house together with the curtilage, including any outbuildings." BLACK'S LAW DICTIONARY 1004 (7th ed.1999).

10. The majority does not—and could not—rely on any allegation that Palmieri somehow *consented* to the search by submitting the permit application. As a threshold matter, nothing in the permit application could be construed as any form of acceptable consent. The permit application was entirely silent as to the need for any inspection of the property.

At oral argument, defendants, for the first time, contended that Palmieri's application for a new permit was, in part, an application for a modification of existing permits, thereby implicating those previous permits in Lynch's search. However, this contention by counsel does not comport with the record. Agent Lynch's only stated purpose in entering Palmieri's yard was to conduct an inspection in reference to Palmieri's application for an additional permit. *See* October 8, 2002, Lynch Declaration.

Even if the previous permits had been an issue in this case, they could not provide sufficient warrant for this invasion of Palmieri's Fourth Amendment rights. The prior permits obtained by Palmieri merely stated that "the permitted site ... is subject to inspection at reasonable hours and intervals by an authorized representative of the [DEC] to determine whether the permittee is complying with this permit." The permits' bare references to inspections at reasonable hours and intervals should not be held to encompass unannounced inspections conducted without the property owner's expressed consent. Indeed, in *Anobile v. Pelligrino*, we held that the plaintiffs' signatures on horse racing license applications, which contained an expressed waiver of the right to object to searches conducted at the raceway, did *not* constitute an effective consent to residential searches. 303 F.3d 107, 123–25 (2d Cir.2002).

Furthermore, even if the permit application or the prior permits *were* somehow deemed to be consent to some sort of inspection, Palmieri could not have been more clear that he intended to exercise his Fourth Amendment right to exclude DEC agents from his home and yard. In addition to enclosing his property in layers of fences and installing large, colorful, and otherwise prominent "Private Property—No Trespassing" and "Beware of Dog," signs, he, on several occasions, issued specific written directions to the DEC to stay off of his property. *See ante* at 76. This certainly qualifies as an unmistakable (and legally enforceable) revocation of any initial, implicit consent. *See Florida v. Jimeno*, 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents.").

rant or probable cause. However, as the Supreme Court explained in *Griffin v. Wisconsin*, in the context of safety and administrative regulations, a search unsupported by probable cause may be reasonable when " 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.' " 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)(quoting *T.L.O.*, 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring in judgment)). In applying this "special needs" exception to the warrant requirement, the Supreme Court has stated that courts must balance three factors: (i) "the nature of the privacy interest allegedly compromised," (ii) "the character of the intrusion," and (iii) the "nature and immediacy of the government's concerns and the efficacy of the [inspection policy] in meeting them." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 830, 832, 834, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002). On the present facts, none of these factors supports an extension of the special needs exception to cover this invasion of Palmieri's home. The right to exclude government agents from the home and the curtilage surrounding the home is eclipsed in Fourth Amendment jurisprudence, if at all, only by the protections afforded to the bodies of citizens. By invading the curtilage surrounding Palmieri's house the DEC agents violated this core Fourth Amendment right. The purpose they served by this entry, inspection as part of a permit granting process, was neither weighty nor immediate. In these circumstances, the DEC cannot claim that it had a need, special or otherwise, to ignore posted signs, closed gates, and specific directions to not enter into Palmieri's yard without permission or a warrant.

For purposes of clarity in marking my departure from the majority, I consider the last of the *Earls* factors, the nature and immediacy of the governmental interest at stake, first.

II. *No Immediate Governmental Interest Would Have Been Compromised if the Defendants Had Respected Palmieri's Fourth Amendment Privilege to Exclude Government Agents from his Home and Curtilage*

Application of the special needs exception requires a weighing of immediate and weighty governmental interests against an individual's Fourth Amendment rights. Here, no interest of the DEC would have been compromised had defendants not conducted the inspection. It follows that Agent Lynch and her cohort had no immediate need to enter the curtilage surrounding Palmieri's home against his expressed wishes and without a warrant. In these circumstances even the slightest of Fourth Amendment interests would be sufficient to deny application of the special needs exception. That core Fourth Amendment rights were violated by the DEC inspectors tilts the balance away from granting the novel and far-reaching extension of the special needs exception endorsed by the majority.

Governmental interests that generally provide for application of the special needs exception to the warrant requirement are a function of either "the Government's need to discover latent or hidden conditions, or to prevent their development," *Earls*, 536 U.S. at 829, 122 S.Ct. 2559 (quoting *Treasury Employees v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)), or immediate necessity, *see, e.g., Clifford*, 464 U.S. at 293, 104 S.Ct. 641 ("[a] burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze."). Neither category of interest is implicated in this case.

That the first category does not warrant application of the special needs exception to the present case is evidenced by the fact that the DEC can state, and the majority can cite, no legitimate governmental need that would have been compromised had the agents not conducted their unwarranted inspection of Palmieri's property. The majority attempts to create such a need by describing the agents' entry as "an attempt to perform a regulatory inspection." *Ante* at 75. This description implies that the purpose of the entry was to service governmental interests in, for example, "protecting the natural resources and the public beaches and waterways." *Ante* at 85 (quoting the District Court below). While I might agree that protection of fragile wetlands is a significant public interest, for the majority's logic to carry through it must be the case that this interest would be compromised in some way by affording Palmieri's home and curtilage full Fourth Amendment protection. *See Earls*, 536 U.S. at 829, 122 S.Ct. 2559 ("A search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.")(internal quotation and citation omitted). This was not the case.

Though the majority implies the contrary, *see ante* at 86, the inspection that Agent Lynch was attempting to conduct was not for the purpose of monitoring or discovering some latent condition on Palmieri's property that might affect the surrounding wetlands. It was, rather, an inspection made pursuant to a permit application submitted by Palmieri seeking permission to construct an addition to a dock extending from his property into the bay.[11] The only possible purpose of the application scheme in general, and this inspection in particular, was to prevent construction of any edifice that might affect the environmental integrity of the Great South Bay. Service of this interest in no way required violating Palmieri's Fourth Amendment rights. That this is so is evidenced by the simple fact that had the DEC agents rung Palmieri's bell, found nobody home, seen the "No Trespassing Signs," respected the wishes there expressed, and left without conducting their search, the permit would not have been granted,[12] Palmieri could not have constructed his dock, and the Great South Bay would have remained pristine. By refusing requests by the DEC to conduct the inspection in the manner they chose the only interests that Palmieri affected were his own. His recalcitrance in no way threatened harm to the Great South Bay.

The majority makes much of the DEC's interest in conducting its permit application inspections "in the manner of its choosing." *Ante* at 83, 85. The majority is particularly concerned about the potential administrative inconvenience of conducting such inspections by visual inspection from the Great South Bay. *See ante* at 85 (surmising that the DEC may not have had an adequate supply of boats to conduct inspections from the water and assuming that the searches by boat would "entail[ ]

---

11. Agent Lynch so states in her October 8, 2002, Declaration. She also explained to Palmieri that this was her purpose in traversing his yard when he confronted her on his patio.

12. The record makes clear that Agent Lynch was aware of this option when she trespassed upon Palmieri's property. In her October 8,

2002, affidavit, Agent Lynch avers that she told Palmieri on the day of the incident in question that because she was not able to conduct the inspection she would not be able to issue the permit he sought. The video recording of their confrontation made by Palmieri confirms Lynch's report.

additional burdens of cost and time"). This ado comes to nothing on the present facts.

I do not need to, and so do not, suggest that the DEC could not make an on-site inspection a requirement in its permit-granting process. I do not dispute that state regulatory agencies, may, as a general rule, establish reasonable guidelines for conducting on-site inspections pursuant to their legislative grants of authority. I acknowledge that "[w]e should not allow applicants to interfere, without good reason, with the DEC's ability to fulfill its statutory and regulatory mandate in a reasonable manner of its choosing." *Ante* at 83. These issues simply are not before us, however.

While Palmieri might have preferred that the DEC conduct its inspection from a boat, I in no way suggest that the Fourth Amendment gave him the power to dictate this term to the DEC. The point I am making, and the only point that need be made, is that the DEC, at all times, had the power to withhold the permit until a satisfactory inspection could be performed. *See Wyman v. James,* 400 U.S. 309, 325, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (holding that a welfare recipient could be denied benefits for refusing to consent to a home visit by a caseworker). Since this authority could have been exercised without violating Palmieri's Fourth Amend-

ment rights I see no danger or inconvenience for the DEC in holding that it should deny applications submitted by individuals who will not submit to inspections on reasonable terms rather than bull its way onto private property when specifically directed not to.

If it was necessary for agents to enter Palmieri's property to conduct the permit inspection, then the DEC should have made this clear. More importantly, when Palmieri gave notice, both in direct communication with the DEC and by posting prominently "No Trespassing" signs on his fences and closed gates, that government agents were not welcomed into his home and curtilage, the DEC should have respected his invocation of his Fourth Amendment right to exclude. Faced with this stand-off, the DEC would have been well within its authority to deny the permit application. As a state actor subject to the Fourth Amendment, however, Agent Lynch had no right whatever to lead a governmental incursion into the private areas of the curtilage surrounding Palmieri's home. I would so hold.

Turning to the immediacy arm of the third *Earls* factor, the majority appears to concede, as it must, that the DEC "lacked an *immediate* need to inspect [Palmieri's property]." [13] *Ante* at 85–86. I cannot understand, however, how the majority can concede this point but not also admit that

---

**13.** In those cases where it has applied the special needs exception, the Supreme Court has consistently focused on this question of immediacy, emphasizing that the delay necessary to obtain a warrant might not only frustrate the governmental interests at stake but might defeat those interests altogether. *See, e.g., Board of Education v. Earls,* 536 U.S. 822, 836, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) ("[T]he need to prevent and deter the substantial harm of childhood drug use provides the necessary immediacy for a school testing policy."); *Vernonia School District 47J v. Acton,* 515 U.S. 646, 662–63, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (finding "im-

mediacy" where the school district's alcohol and drug abuse problems were approaching "epidemic proportions") (internal quotation marks omitted); *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 623, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding that "the Government's interest in dispensing with the warrant requirement is at its strongest when, as here, 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search' " and further explaining that because "alcohol and other drugs are eliminated from the bloodstream at a constant rate, ... blood and breath samples taken to measure whether these substances

no governmental purpose would have been frustrated by the agents' respecting Palmieri's Fourth Amendment rights. After all, the logic underlying both conclusions is the same.

Palmieri merely applied for a permit to extend his dock into the tidal wetlands. There is no suggestion that he had begun construction or was otherwise engaged in conduct that could potentially damage the wetlands. It was understood by all parties that Palmieri could not begin construction until he was granted the permit. Furthermore, the DEC had the authority—indeed, as the majority chronicles, it exercised its authority—to refuse to grant the permit until DEC officials could conduct a satisfactory inspection. The inspectors could have left and come back, left and scheduled a later appointment, left and come back to inspect the area from the water, or left and never come back at all. In none of these circumstances would the government's interests have been harmed in the slightest because Palmieri simply would not have been allowed to build his dock if the DEC was not able to conduct a satisfactory inspection. Therefore, no argument can be made that exigency created a need for an immediate search. Neither, for that matter, can an argument be made that the government had to conduct this search at all, rather than simply deny the application when Palmieri failed to provide DEC agents with the opportunity to conduct the inspection at whatever time and

in whatever manner the agency thought appropriate.

I do not understand how, on these weak premises, the majority can conclude that "the third special needs factor weighs *entirely and heavily* against Palmieri." *Ante* at 85 (emphasis added). Indeed, I do not find that this factor weighs in favor of restricting Palmieri's Fourth Amendment rights at all. It is entirely possible that future cases may present us with more pressing environmental concerns that would warrant the application of the special needs exception to an inspection of a residential property. I do not, then, foreclose one of the majority's proposed holdings, "allow[ing] courts to use the balancing test to determine the reasonableness of particular search activity in the enforcement of environmental regulatory schemes." *Ante* at 86. However, it is axiomatic that our mandate is limited to deciding the case before us and the facts presented here do not require us to ford this Rubicon because the regulatory interests and needs of the DEC in this case could have been vindicated without compromise by simply denying Palmieri's application when he refused to admit DEC agents for an on-site inspection.

III. *By Entering Palmieri's Yard, the Agents Violated Significant Fourth Amendment Rights*

Having concluded that respecting Palmieri's Fourth Amendment rights did not

---

were in the bloodstream when a triggering event occurred must be obtained as soon as possible.... [As a result,] the delay necessary to procure a warrant ... may result in the destruction of valuable evidence.") (internal citations omitted); *Griffin v. Wisconsin*, 483 U.S. 868, 876, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (emphasizing that "the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct and would reduce the deterrent effect that the possibility of expeditious searches would otherwise cre-

ate"); *O'Connor v. Ortega*, 480 U.S. 709, 724, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (applying the special needs exception to work-related intrusions by public employers onto government employees' Fourth Amendment rights after specifically noting that "[t]he delay in correcting the employee misconduct caused by the need for probable cause rather than reasonable suspicion will be translated into tangible and often irreparable damage to the agency's work, and ultimately to the public interest").

compromise in the least any governmental interest, the lightest of privacy interests and the most minimal of invasions would serve to tilt the scales against application of the special needs doctrine in this case. However, the privacy interests implicated on these facts are not light and by physically invading the heavily protected curtilage around Palmieri's home, the agents perpetrated a significant violation of core Fourth Amendment rights.

Much of the majority's decision rides on its wedded conclusions that Palmieri had a diminished right of privacy in his yard and that any violation by the DEC inspectors was, at worst, *de minimis*. Their arguments to these conclusions, however, fail to take account of the Fourth Amendment distinction between visual searches and physical entries. When this distinction is recognized and properly accounted for it is evident that the majority's holding in this case simply does not follow from an application of well-settled Fourth Amendment jurisprudence to the facts of this case.

A. *As the Curtilage Surrounding His Home, Palmieri's Yard Was Entitled to the Most Stringent Fourth Amendment Protection*

The first *Earls* factor requires evaluation of the privacy interest at stake. As the majority rightly notes, " 'the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection.' " *Ante* at 81–82 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d

1116 (1976)). The areas of Palmieri's property that the agents entered were a side yard that runs along his house and a back yard patio that has direct access to Palmieri's livingroom. In addition to being closely proximate to Palmieri's home, evidence in the record discloses that these areas were enclosed by a system of fences, rendering them invisible to all but his neighbors and those traversing the waterway directly behind his home, and that these were areas used predominately for private and domestic purposes.[14] Given these facts, Palmieri's side yard and back yard can only be characterized as part of the curtilage surrounding his home. *See United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (reciting proximity, enclosure, use, and steps taken to protect the area from observation as the four main factors used to distinguish curtilage from open fields).

The curtilage around Palmieri's home is afforded the same "stringent" Fourth Amendment protection as the home itself. *See Dunn*, 480 U.S. at 301, 107 S.Ct. 1134 (factors determining status of property as curtilage establish "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection"); *see also Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (stating that curtilage is afforded the same "Fourth Amendment protections that attach to the home").[15] It is beyond contest that within the penumbra of Fourth Amendment pro-

---

**14.** The video shot by Palmieri during his confrontation with the DEC agents depicts children's toys, recreational equipment, lounge chairs of the type used for sunbathing, a jacuzzi, a gazebo, an outdoor dining area, storage containers, home maintenance supplies, and various other items of a domestic nature arranged in a comfortable disarray that speaks of use in the midst of private daily life,

as opposed to Palmieri's front yard, which is a study of orderly discipline clearly designed and maintained to present a public face.

**15.** Given that the space invaded by the agents in this case is classified as curtilage, the majority's frequent reliance upon cases applying the open fields doctrine is misplaced. *See, e.g., ante* at 84 (citing *Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 416 U.S. 861,

tection is the right to exclude.[16] Both the District Court and the majority concede that Palmieri took all reasonable steps to subjectively manifest his expectation of privacy by constructing physical barriers between his yard and surrounding areas. *See ante* at 81–82.[17] Given these facts, there can be no doubt that Palmieri had a reasonable expectation of privacy in his yard and, more specifically, a reasonable expectation that the Fourth Amendment would protect him against unwarranted intrusions by government agents.

### B. The Agents Physically Invaded the Curtilage Surrounding Palmieri's Home

The majority attempts to minimize the intrusion that occurred by characterizing it as an "attempted visual inspection." *Ante* at 84. This description of what occurred omits most of the facts critical to a Fourth Amendment analysis. The defendants entered Palmieri's backyard through a closed and latched gate that was part of an opaque stockade fence. That gate was posted with a "No Trespassing–Private Property" sign. Defendants walked directly alongside Palmieri's house, winding a path through a dense collection of stor-

age containers, recreational equipment, and home maintenance materials. They passed through a second chain link fence. Finally, they climbed a stairway up to Palmieri's backyard and patio. The majority's attempt to characterize what transpired as a "merely 'visual observation'" ignores the plain fact that the defendants were standing in the middle of Palmieri's patio without any authority for being there. Their presence there, as opposed to their merely looking from someplace else, raises serious Fourth Amendment concerns that cannot be characterized as *de minimis*. *See Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 530–31, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ("even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority.").

### C. The Agents' Physical Invasion of the Curtilage Surrounding Palmieri's Home Constituted a Significant Violation of His Fourth Amendment Rights

The majority does not appear to deny that the agents here perpetrated a physi-

---

864–65, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974)).

**16.** The majority suggests that this may not be so by suggesting that "[Palmieri's] privacy interest in [his yard] [was] somewhat analogous to the diminished level of privacy interest typically recognized to reside in other regulated zones of activity in the public sphere." This is an extraordinary claim and it finds little support in the majority's reference to *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). That case concerned the right of a state firearm control agent to inspect the stock of a licensed dealer. Critical to the Supreme Court's decision in that case, however, was the closely regulated nature of commercial firearm sales and the consent to search given by purveyors of these dangerous weapons when they accept their

licenses to sell. Palmieri was not conducting a business. Construction of a dock does not raise issues anywhere approaching the level of concern raised by the sale of deadly firearms. Most importantly, however, the application for a permit in this case did not grant consent to search and did not implicate any existing condition or ongoing activity that affected a state interest.

**17.** These efforts provide all of the reasonable steps that one could reasonably look for in evaluating whether Palmieri has expressed a reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In particular, the fences and signs provide notice, as clear as walls and closed doors, that he expected government agents not to enter upon his land. The majority agrees. *See ante* at 81–82.

cal violation of Palmieri's Fourth Amendment rights in the curtilage surrounding his home. Rather, my brethren argue that Palmieri had a diminished expectation of privacy in the curtilage around his home because activities he conducted there were visible to some of his neighbors and to others who might happen to float by on the Great South Bay. This conclusion fails to afford sufficient weight to the fact that the DEC inspectors physically entered upon Palmieri's property and did not merely conduct a visual inspection from a public road, a public waterway, public airspace, or some other location where they "ha[d] a right to be." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

It is beyond contest that portions of Palmieri's back yard were visible from a public waterway. As such, he did not merely have a diminished expectation of privacy in activities conducted there, he had *no* expectation of privacy in those activities.[18] That this is so, however, is irrelevant to the Fourth Amendment question posed to us by the facts in this case. In my view, the issue presented here is neither that the DEC inspectors looked nor what they saw, but rather, where they went to do their looking.

All parties agree that the DEC inspectors could conduct a visual inspection of Palmieri's property from the public waterway or the public road that border his property. The DEC had previously conducted inspections of Palmieri's nautical installations from the waterway. Palmieri, far from objecting, has expressed a preference that DEC inspections be conducted from the waterway. I certainly recognize that such inspections by government agents, for whatever purpose, fall well within the bounds of the Fourth Amendment as described in the line of curtilage jurisprudence, which includes *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and *Dow Chemical Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), that stands for the proposition that private areas of the home or curtilage that are visible to members of the public standing in public places are not protected from governmental inspection by agents positioned where they have a right to be. Critical to my agreement, however, is the caveat that the privilege to visually inspect from public space does not diminish the right to exclude. That a living room can be seen from the street by passers-by through a glass window does not diminish the owner's right to prevent entry by government agents. By the logic of the majority's decision, the Court today holds otherwise.

Applicable Supreme Court and circuit precedents make clear that physical entry

---

**18.** The majority's reference to our decision in *United States v. Fields*, 113 F.3d 313 (2d Cir. 1997), *ante* at 81–82, supports this point. There we found that seizure of evidence obtained when police officers observed defendants bagging crack cocaine in front of an unshuttered window was appropriate under the "plain view" doctrine. However, contrary to the majority's implications to the contrary, that doctrine does not apply in this case. There is no allegation that Palmieri was involved in any criminal activity. There were no instruments of criminality within plain view that were subject to seizure. Therefore the plain view doctrine has no application in this case.

The majority's reference to our decision in *United States v. Reyes*, 283 F.3d 446 (2d. Cir. '2002), *ante* at 81–82, is inapt for the same reason. There we upheld the seizure of marijuana plants grown in a portion of a parolee's yard that was visible from public spaces. Of course, Palmieri was neither a parolee nor was he engaged in any illegal activity that would have provided reason for agents to enter his home or property.

to search property is *more* intrusive than visual searches conducted from the periphery. *See Dow Chemical,* 476 U.S. at 237, 106 S.Ct. 1819 (finding that aerial inspection of area in question was permissible but stating that "[a]ny actual physical entry by [the] EPA into any enclosed area would raise significantly different questions"); *United States v. Hatfield,* 333 F.3d 1189, 1198 (10th Cir.2003) (explaining that if the officer had *"physically invaded* the curtilage to make his observation, that would have constituted a search subject to the proscriptions of the Fourth Amendment") (emphasis added); *United States v. Jenkins,* 124 F.3d 768, 774 (6th Cir.1997) ("Visual inspection from a lawful vantage point, however, is quite different from the physical assault on defendants' backyard that occurred in this case."); *United States v. Reilly,* 76 F.3d 1271, 1279 (2d Cir.1996) (noting the fact that information was gathered "only *after* the officers *invaded the area*" put that case in "stark contradistinction to the situation in *Dunn,* where the officers stood *outside the protected curtilage*") (emphasis added); *see also Florida v. Riley,* 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) ("[T]he home and its curtilage are not necessarily protected from inspection that involves *no physical invasion* .... As a general proposition, the police may see what may be seen *'from a public vantage point where [they have] a right to be.'*") (quoting *Ciraolo,* 476 U.S. at 213, 106 S.Ct. 1809) (alteration in original) (emphasis added); *Ciraolo,* 476 U.S. at 213, 106 S.Ct. 1809 ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home *on public thoroughfares.* Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from *a pub-*

*lic vantage point where he has a right to be ...*") (emphasis added).

My colleagues' overly dismissive view of the physical intrusion that occurred in this case as " 'at worst ... a trespass,' " *ante* at 84, (quoting the District Court below) further trivializes the importance of the Fourth Amendment protections at stake. The fact that the inspection at issue in this case involved a trespass does nothing to excuse the constitutional violation, as my colleagues posit, but rather exacerbates it. *See Camara,* 387 U.S. at 531, 87 S.Ct. 1727 ("the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security"). I have found no case—nor, apparently, has the majority—that suggests that a trespass, *de minimis* or otherwise, into an individual's messuage does not constitute a Fourth Amendment violation. This is so because, as the law stood before today's decision, where these most carefully protected places were concerned, "any unauthorized physical penetration [was] a search." *Reed v. Schneider,* 612 F.Supp. 216, 220 (E.D.N.Y.1985) (internal quotation marks omitted).

The distinction between surveillance from public space and physical invasion is no mere philosopher's quibble. The distance, measured in the number and character of rights lost, that lies between accession to surveillance and permission to physically intrude is continental in dimension. By failing to take account of this distinction the majority implies that wherever government agents can see, they may go. That it was a yard in this case provides no security in logic or law that tomorrow it will not be a living room or bedroom seen through a glass window. This marks a radical departure from Supreme Court and Second Circuit case law, forcing homeowners to shutter windows and completely enclose yards or else di-

minish the privacy they enjoy in their homes and curtilage. I simply cannot imagine that the drafters of the Fourth Amendment dictated such dark and cloistered lives for citizens. I dissent today because I too cannot.

D. *The Brevity of the Intrusion Does Not Diminish the Fourth Amendment Violation Perpetrated by the Agents*

Finally, the majority, citing *Moore v. Vega*, 371 F.3d 110 (2d Cir.2004), claims that the government's intrusion did not rise to a constitutional level in part because it "came to an end before [Lynch] was able to conduct the inspection of the dock and its adjoining areas" and because "Lynch departed the premises as soon as Palmieri instructed her to leave." *Ante* at 84. This argument is mystifying and the authority is unavailing. Either the agents violated Palmieri's Fourth Amendment rights or they did not. That the agents left when asked is not relevant. *Vega* does not provide authority in opposition to this view. In *Vega* we found that parole officers' reliance on information that their target parolee lived in Moore's house was reasonable "until they were presented with convincing evidence that the information they had relied upon was incorrect." *Vega*, 371 F.3d at 118. There is no analogy between *Vega* and the case at bar. Here the DEC did not mistake Palmieri's property for another parcel upon which it had a right to enter, it entered Palmieri's property without authority, knowing that the land was his, and in the face of his clear expressions of refusal for any unauthorized entry.

IV. *Conclusion*

The majority rightly points out that "it is wise for courts to be cautious in applying the special needs doctrine, given that it allows for a degree of governmental intrusion into concededly private areas." *Ante* at 80–81. The rule established by the majority today does not exercise the restraint and discretion required of us when we permit government agents to invade the private lives of citizens. Instead, by our decision today we open our neighbors' doors to government agents who can claim even the most remote and gossamer of state interests as license to go wherever their eyes may roam. For this, and for reasons set forth above, I respectfully dissent. I would hold that the DEC inspectors violated Palmieri's Fourth Amendment privilege to exclude government agents from his messuage. In so holding, however, I would recognize that Palmieri does not appear to have proven any significant damages. That his damages might be nominal, however, does not excuse the government's behavior. Neither do I.